Brandon H. Brown (CA Bar No. 26347)
KIRKLAND & ELLIS LLP
555 California Street
San Francisco, CA 94104
Telephone: (415) 439-1400
Facsimile: (415) 439-1500
Email: brandon.brown@kirkland.com

Gregory S. Arovas (*pro hac vice*)
Todd M. Friedman (*pro hac vice*)
Alex R. Henriques (*pro hac vice*)
KIRKLAND & ELLIS LLP
601 Lexington Avenue
New York, NY 10022
Telephone: (212) 446-4800
Facsimile: (212) 446-4900
Email: greg.arovas@kirkland.com
Email: todd.friedman@kirkland.com
Email: alex.henriques@kirkland.com

David Rokach (*pro hac vice*)
Nikhil Krishnan (CA Bar No. 300616)
KIRKLAND & ELLIS LLP
300 North LaSalle
Chicago, IL 60654
Telephone: (312) 862-2000
Facsimile: (312) 862-2200
Email: david.rokach@kirkland.com
Email: nikhil.krishnan@kirkland.com

*Attorneys for Plaintiffs Samsung Electronics Co.,*
*Ltd. and Samsung Electronics America, Inc.*

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

**SAN JOSE DIVISION**

| | |
|---|---|
| SAMSUNG ELECTRONICS CO., LTD. and SAMSUNG ELECTRONICS AMERICA, INC., | CASE NO. 21-CV-02989-EJD |
| Plaintiffs, | **SAMSUNG'S NOTICE OF MOTION UNDER FED. R. CIV. P. 12(C) FOR JUDGMENT OF UNPATENTABILITY UNDER SECTION 101 AND MEMORANDUM IN SUPPORT** |
| v. | |
| BLAZE MOBILE, INC. and MICHELLE FISHER, | Hearing Date:  March 10, 2022
Hearing Time: 9:00 am
Courtroom:     Room 4 - 5th Floor
Judge: Hon. Edward J. Davila |
| Defendants. | |

## NOTICE OF MOTION AND MOTION

PLEASE TAKE NOTICE that, on March 10, 2022, at 9:00 am, or as soon thereafter as the matter can be heard, in the courtroom of the Hon. Edward J. Davila of the U.S. District Court for the Northern District of California, Plaintiffs Samsung Electronics Co., Ltd. and Samsung Electronics America, Inc. ("Samsung") will present their Motion for Judgment on the Pleadings pursuant to Federal Rule of Civil Procedure 12(c).

Samsung respectfully moves the Court to enter a judgment on the pleadings in Samsung's favor with respect to Defendants Blaze Mobile, Inc. and Michelle Fisher's ("Blaze") Counterclaims for Patent Infringement (Dkt. 34, Counts I–XXIV) and Samsung's Counterclaims in Reply for Invalidity (Dkt. 38, Counts I–VIII).  As explained in Samsung's accompanying Memorandum of Points and Authorities, the patents asserted in Blaze's Counterclaims and addressed by Samsung's Counterclaims in Reply are invalid under 35 U.S.C. § 101 for claiming ineligible subject matter.  Samsung's Motion is supported by this Notice and Memorandum, the accompanying supporting declaration of Todd M. Friedman and the exhibits attached thereto, and any oral argument the Court may deem appropriate.

# **TABLE OF CONTENTS**

I.    INTRODUCTION ................................................................................................. 1

II.   ISSUES TO BE DECIDED ................................................................................ 1

III.  BACKGROUND ................................................................................................. 1

IV.   LEGAL STANDARD .......................................................................................... 2

V.    ARGUMENT ....................................................................................................... 3

    A.    THE ADVERTISING PATENTS ARE UNPATENTABLE UNDER § 101 ............................ 3

        1. The Advertising Patents' Claims Are Directed to the Abstract Idea of Providing Targeted Advertising on Mobile Devices. ................................................................ 3

        2. The Advertising Patents' Claims Lack an Inventive Concept. ................................................. 7

    B.    THE NFC SECURITY PATENTS ARE UNPATENTABLE UNDER § 101. ....................... 11

        1. The NFC Security Patents' Claims Are Directed to the Abstract Idea of Providing Security for Transactions on Mobile Devices. .............................................................. 11

        2. The NFC Security Patents' Claims Lack An Inventive Concept. ........................................ 15

    C.    THE MOBILE PAYMENT PATENTS ARE UNPATENTABLE UNDER § 101. ................. 17

        1. The Mobile Payment Patents' Claims Are Directed to the Abstract Idea of Conducting Payment Transactions on Mobile Devices. ................................................ 17

        2. The Mobile Payment Patents' Claims Lack an Inventive Concept. .................................... 21

VI.   CONCLUSION .................................................................................................. 23

## **TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*Affinity Labs of Texas, LLC v. Amazon.com Inc.*,
    838 F.3d 1266 (Fed. Cir. 2016)..................................................................................3, 22

*Affinity Labs of Texas, LLC v. DirecTV, LLC*,
    838 F.3d 1353 (Fed. Cir. 2016)..................................................................................21

*Alice Corp. Pty. v. CLS Bank Int'l*,
    573 U.S. 208 (2014) ............................................................................... *passim*

*Automated Tracking Sols., LLC v. Coca-Cola Co.*,
    723 F. App'x 989 (Fed. Cir. 2018) ...............................................................15

*Barbaro Techs., LLC v. Niantic, Inc.*,
    475 F. Supp. 3d 1007 (N.D. Cal. 2020) ......................................................3

*Bozeman Fin. v. Fed. Reserve Bank of Atlanta*,
    955 F.3d 971 (Fed. Cir. 2020)......................................................................8

*Bridge & Post, Inc. v. Verizon Commc'ns, Inc.*,
    778 F. App'x 882 (Fed. Cir. 2019) ............................................... *passim*

*BSG Tech LLC v. Buyseasons, Inc.*,
    899 F.3d 1281 (Fed. Cir. 2018)...........................................................5, 9, 16

*buySAFE, Inc. v. Google, Inc.*,
    765 F.3d 1350 (Fed. Cir. 2014).............................................................8, 17, 23

*ChargePoint, Inc. v. SemaConnect, Inc.*,
    920 F.3d 759 (Fed. Cir. 2019).......................................................................6

*Customedia Techs., LLC v. Dish Network Corp.*,
    951 F.3d 1359 (Fed. Cir. 2020)............................................................ *passim*

*Data Engine Techs. LLC v. Google LLC*,
    906 F.3d 999 (Fed. Cir. 2018)......................................................................14

*Dworkin v. Hustler Magazine, Inc.*,
    867 F.2d 1188 (9th Cir. 1989) .....................................................................3

*Free Stream Media Corp. v. Alphonso Inc.*,
    996 F.3d 1355 (Fed. Cir. 2021)..............................................................3, 5, 10

*Innovation Scis., LLC v. Amazon.com, Inc.*,
    778 F. App'x 859 (Fed. Cir. 2019) ............................................... *passim*

*Intellectual Ventures I LLC v. Cap. One Bank (USA)*,
   792 F.3d 1363 (Fed. Cir. 2015) ........................................................................3

*Intellectual Ventures I LLC v. Capital One Fin. Corp.*,
   850 F.3d 1332 (Fed. Cir. 2017) ......................................................................10

*Inventor Holdings, LLC v. Bed Bath & Beyond, Inc.*,
   876 F.3d 1372 (Fed. Cir. 2017) .......................................................17, 20, 21, 23

*In re Jobin*,
   811 F. App'x 633 (Fed. Cir. 2020) .............................................................8, 16

*Mayo Collaborative Servs. v. Prometheus Labs., Inc.*,
   566 U.S. 66 (2012) ........................................................................................2, 8

*Ex Parte Michelle Fisher*,
   No. APPEAL 2019-004734, 2020 WL 1041299 (P.T.A.B. Feb. 28, 2020) ................... *passim*

*In re Morsa*,
   809 F. App'x 913 (Fed. Cir. 2020) ...................................................................3

*OpenTV v. Apple Inc.*,
   5:15-cv-02008-EJD, 2016 WL 344845 (N.D. Cal. Jan. 28, 2016) ....................11, 21

*Priceplay.com, Inc. v. AOL Advertising, Inc.*,
   83 F. Supp. 3d 577 (D. Del. 2015) .................................................................18

*Prism Techs. LLC v. T-Mobile USA, Inc.*,
   696 F. App'x 1014 (Fed. Cir. 2017) .................................................................11

*SAP Am., Inc. v. InvestPic, LLC*,
   898 F.3d 1161 (Fed. Cir. 2018) ........................................................................3

*Smartflash LLC v. Apple Inc.*,
   680 F. App'x 977 (Fed. Cir. 2017) ..................................................................22

*SynKloud Techs., LLC v. HP Inc.*,
   490 F. Supp. 3d 806 (D. Del. 2020) ...............................................................10

*In re TLI Commc'ns LLC Pat. Litig.*,
   823 F.3d 607 (Fed. Cir. 2016) ...........................................................6, 7, 15, 22

*Tridia Corp. v. Sauce Labs, Inc.*,
   No. 1:15-CV-02284-LMM, 2016 WL 4007674 (N.D. Ga. July 14, 2016) .............10

*Two-Way Media Ltd. v. Comcast Cable Commc'ns, LLC*,
   874 F.3d 1329 (Fed. Cir. 2017) ..................................................................14, 21

*Universal Secure Registry LLC v. Apple Inc.*,
   10 F.4th 1342 (Fed. Cir. 2021) ................................................................ *passim*

1

2

*VeriPath, Inc. v. Didomi,*
    842 F. App'x 640 (Fed. Cir. 2021) ..........................................................................8

3

*Virginia Innovation Scis., Inc. v. Amazon.com, Inc.,*
    No. 1:16-cv-00861, 2017 WL 11500121 (E.D. Va. Dec. 22, 2017)........................................20

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1

## I.     INTRODUCTION

To be eligible for patenting under 35 U.S.C. § 101, patent claims that are directed to abstract ideas must introduce an inventive concept that is "sufficient to ensure that the patent in practice amounts to significantly more than a patent upon the [abstract concept] itself." *Alice Corp. Pty. v. CLS Bank Int'l*, 573 U.S. 208, 218 (2014).  The eight patents-in-suit in this case are directed to performing on a mobile device three well-established commercial activities—targeted advertising, providing security for purchase transactions, and conducting payments.  Under well-defined Federal Circuit precedent, this subject matter is abstract—and because the patents-in-suit merely recite the use of conventional computing components and steps to implement these abstract concepts on mobile devices, their claims lack any sufficient inventive concept.  Samsung therefore respectfully moves under Federal Rule of Civil Procedure 12(c) for a judgment holding the patents-in-suit invalid under § 101 and dismissing Blaze's infringement claims.

## II.     ISSUES TO BE DECIDED

1. Whether U.S. Pat. Nos. 9,996,849, 10,339,556, and 10,621,612 (the "Advertising Patents") should be held invalid under 35 U.S.C. § 101—and Blaze's infringement claims asserting them should be dismissed—because these patents are directed to an abstract idea and fail to incorporate an inventive concept.

2. Whether U.S. Pat. Nos. 9,378,493, 9,652,771, and 10,565,575 (the "NFC Security Patents") should be held invalid under 35 U.S.C. § 101—and Blaze's infringement claims asserting them should be dismissed—because these patents are directed to an abstract idea and fail to incorporate an inventive concept.

3. Whether U.S. Pat. Nos. 10,699,259 and 10,825,007 (the "Mobile Payment Patents") should be held invalid under 35 U.S.C. § 101—and Blaze's infringement claims asserting them should be dismissed—because these patents are directed to an abstract idea and fail to incorporate an inventive concept.

## III.     BACKGROUND

Samsung brought this declaratory judgment action on April 25, 2021 to dispel the cloud of controversy created by Blaze's patent infringement accusations against Samsung.  (Dkt. 1.)  On September 13, 2021, Blaze filed its Answer and Counterclaims alleging infringement of the same eight patents raised

in Samsung's Complaint.  (Dkt. 30.)  Samsung subsequently filed its Answer to Counterclaims and Counterclaims in Reply, and Blaze filed its Answer to Counterclaims in Reply.  (Dkts. 38, 41.)  The pleadings are now closed.

In addition to bringing the non-infringement case set forth in its declaratory judgment Complaint, Samsung has sought to vindicate its rights by: (i) filing *inter partes* review ("IPR") proceedings challenging the validity of each of the eight patents-in-suit in view of the prior art; and (ii) raising counterclaims in the present action challenging the validity of the patents-in-suit, including for failing to meet the requirements of 35 U.S.C. § 101.  On October 6, 2021, Samsung moved to stay this case pending the outcome of the IPR proceedings, because those proceedings provide a streamlined mechanism that is likely to simplify—if not entirely resolve—the parties' dispute.  (Dkt. 39.)  Another mechanism for resolving this case upfront, in whole or in significant part, is for this Court to evaluate the asserted claims' patentability under § 101 now, at the close of the pleading stage.  To address that issue, Samsung brings the present motion.

## IV.    LEGAL STANDARD

The Supreme Court in *Alice Corp. Pty. v. CLS Bank Int'l* established a two-part test for evaluating whether subject matter is patentable under 35 U.S.C. § 101.  The *Alice* test requires a court to: (i) determine whether a patent claim is "directed to" a patent-ineligible abstract idea; and (ii) if so, consider whether the claims "contain[] an 'inventive concept' sufficient to 'transform' the claimed abstract idea into a patent-eligible application" of the idea.  *Alice*, 573 U.S. at 217, 221 (quoting *Mayo Collaborative Servs. v. Prometheus Labs., Inc.*, 566 U.S. 66, 72, 79-80 (2012)).  Simply implementing an abstract idea through "'well-understood, routine, conventional activit[ies]' previously known to the industry" is insufficient to supply the required inventive concept.  *Id.* at 225 (alteration in original) (quoting *Mayo*, 566 U.S. at 73).  In particular, limiting an abstract idea's application "to a particular technological environment," such as the Internet, or implementing it through "wholly generic computer[s]" is insufficient to satisfy the *Alice* test.  *Id.* at 223.

Federal Rule of Civil Procedure 12(c) provides that "[a]fter the pleadings are closed—but early enough not to delay trial—a party may move for judgment on the pleadings."  Fed. R. Civ. P. 12(c).  "A motion for judgment on the pleadings is 'functionally identical' to a Rule 12(b)(6) motion to dismiss."

*Barbaro Techs., LLC v. Niantic, Inc.*, 475 F. Supp. 3d 1007, 1011 (N.D. Cal. 2020) (quoting *Dworkin v. Hustler Magazine, Inc.*, 867 F.2d 1188, 1192 (9th Cir. 1989)). "[C]ourts can, and regularly do, decide the issue of § 101 invalidity on a Rule 12(c) motion" and dismiss infringement claims based on patents determined to be unpatentable. *Id.*; *see also, e.g.*, *SAP Am., Inc. v. InvestPic, LLC*, 898 F.3d 1161, 1166 (Fed. Cir. 2018) (noting § 101 invalidity "may be, and frequently has been, resolved on a Rule 12(b)(6) or (c) motion").

## V.    ARGUMENT

### A.    The Advertising Patents Are Unpatentable Under § 101.

Blaze's '849, '556, and '612 patents-in-suit are directed to providing targeted advertising—*i.e.*, advertising that is customized based on information regarding particular consumers—on mobile devices. These Advertising Patents share a common specification and claim substantially similar subject matter. The Advertising Patents' claims are unpatentable under § 101 because the Federal Circuit has found that their subject matter—targeted advertising—is an abstract concept, and their claims merely recite the use of conventional computing components and functions to implement this abstract idea on mobile devices.

#### 1.    The Advertising Patents' Claims Are Directed to the Abstract Idea of Providing Targeted Advertising on Mobile Devices.

The Federal Circuit has recognized that the "[t]he concept of tailoring advertisements based on user data" is an abstract idea that "dates back at least to local radio and television advertisements." *Bridge & Post, Inc. v. Verizon Commc'ns, Inc.*, 778 F. App'x 882, 884, 887 (Fed. Cir. 2019) (quoting *Intellectual Ventures I LLC v. Cap. One Bank (USA)*, 792 F.3d 1363, 1369–70 (Fed. Cir. 2015)); *see also Affinity Labs of Texas, LLC v. Amazon.com Inc.*, 838 F.3d 1266, 1271 (Fed. Cir. 2016) (similar). Accordingly, the Federal Circuit has repeatedly determined that claims directed to targeted advertising—including targeted advertising delivered on mobile devices—are unpatentable. *See, e.g.*, *Free Stream Media Corp. v. Alphonso Inc.*, 996 F.3d 1355, 1365 (Fed. Cir. 2021) (holding claims ineligible for patenting because they were directed to "the abstract idea of providing targeted advertising to the mobile device user"); *Customedia Techs., LLC v. Dish Network Corp.*, 951 F.3d 1359, 1362–65 (Fed. Cir. 2020) (similar); *In re Morsa*, 809 F. App'x 913, 917 (Fed. Cir. 2020) (similar).

The Advertising Patents' claims are directed to the abstract concept of conducting targeted advertising on a mobile device. The claims recite the generic steps of "maintaining" an advertisement and "selecting" and "sending" that "advertisement" to a "mobile device" in response to "user input" from an app and based on broadly-defined "targeting parameters" regarding the user. For example, claim 1 of the '849 patent recites:

> 1. A method for delivering an advertisement, comprising:
>
> maintaining, at a remote management server, the advertisement;
>
> selecting, at the remote management server, the advertisement based on one or more targeting parameters in response to user input from a non-browser based application stored on a mobile device, wherein the one or more targeting parameters comprise personal information and purchase transaction related information wherein the non-browser based application stored on the mobile device receives the user input via a mobile device display wherein the non-browser based application is a non-browser based application with a graphical user interface that is preinstalled or downloaded and installed on the mobile device, the mobile device comprising the mobile device display, a mobile device processor, and a mobile device wireless radio interface;
>
> sending, from the remote management server, the advertisement to the non-browser based application and further wherein the non-browser based application displays the advertisement within a specific non-browser based application generated screen, the specific non-browser based application generated screen corresponding to a specific screen or area of the non-browser based application.

(Dkt. 1-3, '849 Patent at claim 1.)  Claim 12 of the '849 patent, which is the patent's only other independent claim, recites the same subject matter in an apparatus-claim format.  (*See id*. at claim 12.) Independent claims 1 and 16 of the related '556 patent are likewise directed to the abstract concept of conducting targeted advertising on a mobile device, and differ from the '849 patent's claims only in that: (i) the advertisements selected in response to "user input" are not required to be based on "targeting parameters"; and (ii) the app's user interface requires a "graphical icon."  (Dkt. 1-4, '556 Patent at claims 1, 16.)  Independent claims 1 and 20 of the related '612 patent repeat the subject matter of the '556 patent's

1  claims, except that the '612 patent's claims recite the method steps from the perspective of the mobile

2  device, rather than the server.  (*See* Dkt. 1-5, '612 Patent at claims 1, 20.)[1]

3       The Advertising Patents' claims closely resemble claims that the Federal Circuit has determined

4  were impermissibly directed to the unpatentably abstract concept of conducting targeted advertising.  For

5  example, the claims that the Federal Circuit held unpatentable in *Bridge & Post* "require[d] receiving a

6  user request to access a website, retrieving a 'persistent device identifier' from the user's device, and

7  gathering current and historical information about both the user and the device," with the "collected

8  information and identifier [being] analyzed to determine what advertisement (or other tailored media)

9  should be shown to the user."  *Bridge & Post*, 778 F. App'x at 885.  Similarly, the claims that were ruled

10 patent-ineligible in *Free Stream Media* required: "(1) gathering information about television users'

11 viewing habits; (2) matching the information with other content (i.e., targeted advertisements) based on

12 relevancy to the television viewer; and (3) sending that content to a second device."  *Free Stream*, 996

13 F.3d at 1361–62.  As illustrated above, the Advertising Patents' claims contain similar limitations and

14 steps that are directed to the same abstract idea of sending a targeted advertisement to a user's device

15 based on information collected about the user.

16       Notably, to implement the abstract idea of targeted advertising, the Advertising Patents' claims

17 recite only generic computer components such as a "remote management server" and a "mobile device"

18 with a "processor," a "display," a "wireless radio interface," a "graphical user interface," and a "non-

19 browser based application"[2] with a "screen."  (*See, e.g.*, Dkt. 1-3, '849 Patent at claim 1; Dkt. 1-4, '556

20

21 [1] As discussed below in connection with the second step of the *Alice* test, the Advertising Patents'

22 dependent claims are directed to the same abstract concept of conducting targeted advertising on a mobile

23 device and merely add further conventional requirements regarding the concept's implementation.

24 [2]  The parties' contrasting positions regarding the scope of the term "non-browser based application" (*see*

25 Dkt. 1 at 6–7; Dkt. 34 at 21) do not affect the § 101 eligibility analysis, because narrowing this term does

26 not change the fact that it recites a conventional computer component.  *See, e.g.*, *BSG Tech LLC v.*

27 *Buyseasons, Inc.*, 899 F.3d 1281, 1287 (Fed. Cir. 2018) ("a claim is not patent eligible merely because it

28 applies an abstract idea in a narrow way"); *Bridge & Post*, 778 F. App'x at 889 (limiting claims "to a

Patent at claim 1; Dkt. 1-5, '612 Patent at claim 1.)  These components all perform generic computer functions such as "maintaining," "selecting," "receiv[ing]," "sending," and "display[ing]." (*Id.*)  As such, the claims as a whole "amount to nothing more than a computer-implementation of targeted marketing over the Internet" and fail to "change the focus of the claim" from that abstract concept.  *Bridge & Post*, 778 F. App'x at 887 (finding "recited steps of 'retrieving a persistent device identifier,' 'determining' and 'retrieving' information associated with the identifier, 'analyzing' the information, and 'placing directed media' based on that analysis are nothing more than a computer-implementation of targeted marketing over the Internet" and failed to render the claims non-abstract); *see also, e.g.*, *In re TLI Commc'ns LLC Pat. Litig.*, 823 F.3d 607, 611 (Fed. Cir. 2016) ("merely provid[ing] a generic environment in which to carry out the abstract idea" does not rescue claims from abstraction).

The Advertising Patents' specification further confirms that the abstract concept of targeted advertising constitutes the claims' focus.  *See ChargePoint, Inc. v. SemaConnect, Inc.*, 920 F.3d 759, 768 n.2 (Fed. Cir. 2019) ("At step one [of the *Alice* test], we look to what the specification describes as the invention . . . to help understand the focus of the claims.").  According to the patents' specification, the purported invention seeks to solve the problem that "delivering separate, customized mobile applications to mobile communications devices can be quite expensive in terms of cost and memory." (Dkt. 1-3, '849 Patent at 1:38–46.)  The specification describes an alleged solution that makes use of a "mobile application having a ***generic*** platform" that is "customiz[ed] . . . based on information specific to [a] special interest group (SIG) that is affiliated with the user" to display a targeted "advertisement, and other information." (*Id.* at 1:52–66 (emphasis added).)  In other words, the patentees sought to address the commercial problem identified in the Advertising Patents by using targeted advertisements in connection with a "generic" mobile device platform.

_____

particular networking environment does not render [them] any less abstract").  Indeed, the Patent and Trademark Appeals Board found, in the context of a patent application filed by Blaze, that a "non-browser application" is a conventional computing feature.  *See Ex Parte Michelle Fisher*, No. APPEAL 2019-004734, 2020 WL 1041299, at *8–9 (P.T.A.B. Feb. 28, 2020).

Moreover, the Patent and Trademark Appeals Board found just last year that substantially similar claims appearing in a since-abandoned Blaze patent application were directed to the abstract idea of "customizing delivery of artifacts, e.g., advertisements or other content, to a user on a mobile device based on targeting parameters." *Ex Parte Michelle Fisher*, 2020 WL 1041299, at *7 (determining U.S. Pat. App. 14/867,328 claimed unpatentably abstract subject matter). Similar to the Advertising Patents, Blaze's abandoned application recited "a method for sending a digital artifact" (such as an advertisement), where the method comprised "receiving at a remote management server a request . . . from a non-browser based mobile application," "selecting . . . the digital artifact based on one or more targeting parameters," and "sending . . . the digital artifact . . . to the mobile application for display within the specific non-browser based mobile application generated screen." *Id*. at *1–2. The Board recognized that Blaze's claims focused on the abstract idea of conveying targeted advertising (or similar information) and observed that this focus was not changed by the recitation of "generic hardware and software components performing their known functions in a logical order." *Id*. at *9. The Advertising Patents' claims are unpatentably abstract for the same reason.

## 2.    The Advertising Patents' Claims Lack an Inventive Concept.

To supply the "inventive concept" needed to avoid invalidity, "it is not enough . . . to merely improve a fundamental practice or abstract process by invoking a computer merely as a tool." *Customedia*, 951 F.3d at 1364. Similarly, "[i]t is well-settled that mere recitation of concrete, tangible components is insufficient . . . . Rather, the components must involve more than performance of well-understood, routine, conventional activities previously known to the industry." *In re TLI*, 823 F.3d at 613. The Advertising Patent claims lack an inventive concept because they merely implement the abstract idea of targeted advertising using particular arrangements of well-understood, routine, conventional computing components and functionalities.

As discussed above, the Advertising Patents' claims recite interactions between computing components and data to generate targeted advertising. These computing components—such as a "remote management server," a "non-browser based application," and a "mobile device" comprising a "mobile device display, a mobile device processor, and a mobile device wireless radio interface"—are purely conventional and generic in nature. (Dkt. 1-3, '849 Patent at claims 1, 12; Dkt. 1-4, '546 Patent at claims

1, 16; Dkt. 1-5, '612 Patent at claims 1, 20.)  Indeed, far from asserting that any of these components is somehow unconventional, the patents' specification acknowledges that they are generic.  For example, the specification describes the mobile application as using a "*generic* platform" with "a *generic* user interface."  (Dkt. 1-3, '849 Patent at 2:3–7, 3:58–62, 5:31–33 (emphasis added).)  The specification likewise states that the mobile device "can be a cellular phone, a wireless personal digital assistant (PDA), or other wireless communication device"—all of which are generic categories.  (*Id.* at 3:30-33.)  And the specification describes the remote management server merely as "a remote server."  (*Id.* at 3:35–38.)  Such "generic and functional hardware is insufficient to render eligible claims directed to an abstract idea." *Customedia*, 951 F.3d at 1366 (finding "a programmable receiver unit, a storage device, a remote server and a processor" are "generic computer components" and fail to supply any inventive concept); *see also, e.g.*, *In re Jobin*, 811 F. App'x 633, 637–38 (Fed. Cir. 2020) (finding "'online system,' 'server,' 'data structure,' and 'user device' elements recite generic technology for implementing the claimed abstract idea [and] do not transform the claim into a patent eligible application").

The activities of the generic components recited in the claims—*i.e.*, "maintaining," "selecting," "receiv[ing]," "sending," and "display[ing]" information—also are conventional.  (Dkt. 1-3, '849 Patent at claims 1, 12; Dkt. 1-4, '546 Patent at claims 1, 16; Dkt. 1-5, '612 Patent at claims 1, 20.)  These actions all constitute "basic functions of a computer" that are "'well-understood, routine, conventional activit[ies]' previously known to the industry," and therefore fail to supply an inventive concept.  *Alice*, 573 U.S. at 225 (quoting *Mayo,* 566 U.S. at 73); *see also, e.g.*, *Bozeman Fin. v. Fed. Reserve Bank of Atlanta*, 955 F.3d 971, 979–80 (Fed. Cir. 2020) ("the use of well-known computer components to collect, analyze, and present data . . . does not render these claims any less abstract"); *buySAFE, Inc. v. Google, Inc.*, 765 F.3d 1350, 1355 (Fed. Cir. 2014) ("That a computer receives and sends the information over a network—with no further specification—is not even arguably inventive.").

In addition, the particular order of the claimed steps "adds nothing . . . that is not already present when the steps are considered separately."  *Mayo*, 566 U.S. at 79.  As illustrated above, the claims recite, in order, maintaining an advertisement, selecting it, providing it to an application, and displaying it.  That sequence represents nothing more than routine and conventional computer activity.  *See, e.g.*, *VeriPath, Inc. v. Didomi*, 842 F. App'x 640, 644 (Fed. Cir. 2021) ("VeriPath fails to explain how generating a

1    disclosure before it is presented to the user is anything but routine and conventional under *Alice* step

2    two."); *Ex Parte Michelle Fisher*, 2020 WL 1041299, at *9 (concluding that "receiving a request for an

3    artifact, selecting the artifact according to predetermined parameters in response to that request, and

4    sending the selected artifact for display" is a "logical order" that fails to provide an inventive concept).

5    At bottom, the ordered combination recited in the Advertising Patents' claims is nothing more than the

6    "steps necessary to implement the abstract idea" of targeted advertising on a mobile device, and is

7    insufficient to supply an inventive concept.  *Bridge & Post*, 778 F. App'x at 882.

8          Further, while the Advertising Patents' dependent claims purport to narrow the claimed invention

9    in certain ways, they merely recite the same abstract concept of conducting targeted advertising on a

10   mobile device with some additional requirements regarding its specific implementation, without providing

11   any inventive concept.  For example, the '849 patent's dependent claims require certain types of targeting

12   parameters (*see* Dkt. 1-3, '849 Patent at claims 2, 8, 10, 14, 20), certain types of users (*see id.* at claims 4,

13   16), the use of a generic computer caching functionality when not connected to a network (*see, e.g.*, *id.* at

14   claims 3, 9, 13, 15), reconnecting to a wireless network (*see id.* at claims 5, 7), sending alerts if messages

15   are not received (*see id.* at claims 6, 20), and the use of a "graphical icon" for user interaction (*id.* at claims

16   7, 19).  Significantly, however, "a claim is not patent eligible merely because it applies an abstract idea in

17   a narrow way," and "narrowing does not supply an inventive concept."  *BSG Tech*, 899 F.3d at 1287,

18   1291; *see also Bridge & Post*, 778 F. App'x at 889.  The additional requirements recited in the '849

19   patent's dependent claims still involve purely conventional computing components and functionalities.

20   The '556 and '612 patents' dependent claims similarly specify additional conventional implementations

21   of the same abstract concept of targeted advertising.  Several of those two patents' dependent claims

22   merely track dependent claims found in the '849 patent.  (*Compare* Dkt. 1-3, '849 Patent at claims 1–11,

23   *with* Dkt. 1-4, '556 Patent at claims 6–15, *and* Dkt. 1-5, '612 Patent at claims 6–14, 16, 25–33, 35.)  Other

24   dependent claims of the '556 patent add requirements regarding conventional functions such as automatic

25   selection (*see* Dkt. 1-4, '556 Patent at claim 2), excluding certain targeting factors (*see id.* at claim 3), a

26   call to action in "metadata" (*id.* at claims 4–5, 17–19), and the use of a "PIN" or "biometric data" (*id.* at

27   claims 24–26).  The '612 patent's dependent claims mirror the '556 patent's (*see* Dkt. 1-5, '612 Patent at

28   claims 2–5, 17–19, 21–24) or otherwise simply specify a particular data format and organization (*see id.*

1   at claims 15, 34). None of these claims reciting additional well-known functionalities provides any

2   inventive concept or alters the concept's fundamentally abstract nature. *See, e.g.*, *Customedia*, 951 F.3d

3   at 1366 ("[a]side from the abstract idea of delivering targeted advertising, the claims recite only generic

4   computer components, including a programmable receiver unit, a storage device, a remote server and a

5   processor"); *Free Stream*, 996 F.3d at 1365 ("the alleged technological improvement does nothing more

6   than implement a computer to achieve the abstract idea of providing targeted advertising to the mobile

7   device user").

8       Blaze's pleadings likewise fail to show an inventive concept. Blaze's Counterclaims provide only

9   one example of any alleged "improvements" made by the Advertising Patents, citing "a coupon (i.e.,

10  advertisement) which can be displayed in the non-browser based application if the mobile device is offline

11  and loses connection with a wireless network." (Dkt. 30 ¶ 22.) As an initial matter, none of the

12  Advertising Patents' independent claims recites this feature. Regardless, this limitation fails to supply an

13  inventive concept even in the dependent claims where it appears. Dependent claim 3 of the '849 patent

14  recites, for example, that "the advertisement is cached on the mobile device and is accessible by the non-

15  browser based application when there is not a wireless network connection." (Dkt. 1-3, '849 Patent at

16  claim 3.) However, caching—*i.e.*, storing data in memory—is just one more conventional computing

17  function that is performed using conventional components. *See, e.g.*, *Tridia Corp. v. Sauce Labs, Inc.*,

18  No. 1:15-CV-02284-LMM, 2016 WL 4007674, at *11 (N.D. Ga. July 14, 2016) ("Storing data in memory,

19  including cache memory, is a generic computer function and does not transform the claims into patent

20  eligibility."); *SynKloud Techs., LLC v. HP Inc.*, 490 F. Supp. 3d 806, 817 (D. Del. 2020) ("The patent thus

21  appears to describe nothing more than the generic operation of cache memory, as understood by a skilled

22  artisan."). Far from adding any inventive details regarding how the purported invention carries out the

23  well-known, generic functionality of storing data in memory, the claims merely recite the commonplace

24  and expected result that the stored data will be accessible without a wireless connection. *See Intellectual

25  Ventures I LLC v. Capital One Fin. Corp.*, 850 F.3d 1332, 1342 (Fed. Cir. 2017) ("[o]ur law demands

26  more" than claim language that "provides only a result-oriented solution, with insufficient detail for how

27  a computer accomplishes it"). Nor does the specification indicate that the inventors actually considered

28  this conventional feature to be inventive or believed that it solved any supposed problem in the prior art.

1    For all of these reasons, the Advertising Patents fail to introduce any inventive concept that could make

2    patentable their claims directed to the abstract idea of conducting targeted advertising on a mobile device.

3         **B.    The NFC Security Patents Are Unpatentable Under § 101.**

4         Blaze's '771, '493, and '575 patents-in-suit all relate to using a code to provide security for

5    processing economic transactions over near-field communications ("NFC").    Like the Advertising

6    Patents' claims, the claims of these NFC Security Patents are ineligible for patenting because the Federal

7    Circuit has held that their subject matter—providing security for commercial transactions—is

8    unpatentably abstract, and rather than supply any inventive concept, their claims merely recite

9    conventional computing components and functions for implementing this abstract concept over NFC.

10             **1.    The NFC Security Patents' Claims Are Directed to the Abstract Idea of
              Providing Security for Transactions on Mobile Devices.**

12         The Federal Circuit has repeatedly held that the concept of providing security for economic

13   transactions—including transactions conducted over a network—is a well-known and unpatentably

14   abstract idea.  *See Innovation Scis., LLC v. Amazon.com, Inc.*, 778 F. App'x 859, 863 (Fed. Cir. 2019)

15   (holding that "securely processing a credit card transaction with a payment server" is an abstract idea);

16   *Prism Techs. LLC v. T-Mobile USA, Inc.*, 696 F. App'x 1014, 1016 (Fed. Cir. 2017) (holding "systems

17   and methods that control access to protected computer resources by authenticating identity data" are

18   unpatentably abstract); *Universal Secure Registry LLC v. Apple Inc.*, 10 F.4th 1342, 1353 (Fed. Cir. 2021)

19   (finding concept of "verifying the identity of a user to facilitate an economic transaction" is "a fundamental

20   economic practice that has been performed at the point of sale well before the use of POS computers and

21   Internet transactions").[3]    Indeed, the Supreme Court's *Alice* decision specifically held that patent claims

22   directed to "exchanging financial obligations between two parties using a third-party intermediary to

23   mitigate settlement risk" were abstract.  *Alice*, 573 U.S. at 219.

---

26   [3]  *See also OpenTV v. Apple Inc.*, 5:15-cv-02008-EJD, 2016 WL 344845, at *5 (N.D. Cal. Jan. 28, 2016)

27   (finding "practice of controlling access to information by verifying credentials (via well-known encryption

28   methods)" is "a long-standing and well understood business practice that predates the internet").

The NFC Security Patents' claims are similarly directed to the abstract concept of providing security for an economic transaction conducted over a network—in this case, using a mobile device. The patents purport to claim an approach to providing transaction security using an "identification code" in connection with communications between a "mobile device," "secure element memory," and an "NFC terminal." For example, claim 1 of the '771 patent recites:

> 1. A method for conducting a Near Field Communication (NFC) transaction using an NFC protocol, the method comprising:
>
> storing a non-browser based-application in a mobile device memory included in the mobile device, wherein the non-browser based application is a mobile operating system platform non browser based mobile application preinstalled or downloaded and installed on the mobile device, the mobile device comprising a mobile device display, a mobile device processor, a mobile device transceiver that supports voice and data interactions through a first communication channel, an NFC transceiver configured to use the NFC protocol through a second communication channel, an NFC processor configured to use the NFC protocol, and a secure element memory, wherein the secure element memory includes an identification code and a secure element application configured to use the NFC protocol;
>
> receiving, at the non-browser based application, user authentication information, wherein the non-browser based application stored on the mobile device receives the user authentication information via the mobile device display of the mobile device and further wherein the user authentication information includes biometric data;
>
> upon receipt of the user authentication information, authenticating, at the mobile device, a user associated with the user authentication information before the NFC transaction;
>
> executing the secure element application by the NFC processor in response to a near field communication inductive signal by an NFC terminal; and
>
> transmitting, using the secure element application, the identification code via the second communication channel to the NFC terminal, wherein the identification code is transmitted to a server for processing the near field communication transaction using a payment method that corresponds to the identification code.

(Dkt. 1-2, '771 Patent at claim 1.)  Claims 10 and 19 of the '771 patent, which are the patent's only other independent claims, recite this same subject matter in an apparatus claim format and a computer readable medium claim format, respectively.  (*See id.* at claims 10, 19.)  Independent claims 1 and 9 of the related '493 patent are likewise directed to the concept of providing security for an economic transaction conducted via NFC, and differ from the '771 patent's claims only in specifying that an identification code is transmitted to a management server and in omitting certain limitations found in the '771 patent's claims.  (*See* Dkt. 1-1, '493 Patent at claims 1, 9.)  Independent claims 1 and 14 of the '575 patent repeat the subject matter of the '493 patent's claims, but add steps regarding the communication of the recited data and the storage of payment information on the management server.  (*See* Dkt. 1-7, '575 Patent at claims 1, 14.)

The NFC Security Patents' claims are highly similar to payment transaction security claims that the Federal Circuit has previously found were directed to unpatentably abstract ideas.  For example, in *Universal Secure Registry*, the Federal Circuit found that claims directed to the use of a "time-varying code" to "access a database that indicates any restrictions on the user's transactions" and "allows a third party or credit card company to approve or deny the transaction" were unpatentably abstract.  *Universal Secure Registry*, 10 F.4th at 1349.  Similarly, the *Innovation Sciences* decision involved a claim that recited "receiving credit card payment information at a server," "sending the payment information 'to an established financial channel,'" "receiving a 'processing decision,'" "sending payment confirmation," and then "updating the server supporting . . . that the item was purchased."  *Innovation Scis.*, 778 F. App'x at 863.  As illustrated above, the NFC Security Patents likewise recite such routine steps for providing security for a payment transaction.

Further, the NFC Security Patents implement the abstract idea of providing security for an economic transaction by relying on purely conventional computer functionalities, such as "transmitting," "transferring," "receiving," "storing," "maintaining," "authenticating," and "executing," as well as purely conventional components, such as a "mobile device," a "secure element," and a "server" (including a "management server" and a "transaction server").  (*See, e.g.*, Dkt. 1-2, '771 Patent at claim 1; Dkt. 1-7, '575 Patent at claim 1; Dkt. 1-1, '493 Patent at claim 1.)  In reciting such conventional functionalities and components, the claims ultimately amount to nothing more than "a method for enabling a transaction

between a user and a merchant, where the merchant is given a . . . code"—an approach the Federal Circuit has confirmed is impermissibly abstract.  *Universal Secure Registry*, 10 F.4th at 1349.  Indeed, the claims' exclusive focus on functionally-described results, rather than specifying any alleged improvements in the components or their operation, further underscore the claims' abstract nature.  *See Two-Way Media Ltd. v. Comcast Cable Commc'ns, LLC*, 874 F.3d 1329, 1337 (Fed. Cir. 2017) (observing that "claim requires the functional results of 'converting,' 'routing,' 'controlling,' 'monitoring,' and 'accumulating records,' but does not sufficiently describe how to achieve these results in a non-abstract way").

The NFC Security Patents' specification and prosecution history likewise confirm that their claims focus on the abstract concept of providing security for economic transactions.  After acknowledging that "[m]obile communication devices" are "increasingly being used to conduct payment transactions," the specification states that the purported invention seeks "to protect a user from fraudulent usage due to, e.g., loss or theft of a mobile communication device."  (Dkt. 1-2, '771 Patent at 1:26–43; Dkt. 1-1, '493 Patent at 1:36-38.)  The specification depicts the components used to accomplish this general goal simply as a collection of nondescript boxes labeled "mobile communication device," "point of sale device," and "remote server."  (Dkt. 1-2, '771 Patent at Fig. 1, 2:39-42; Dkt. 1-1, '493 Patent at Fig. 1, 2:33-36; Dkt. 1-7, '575 Patent at Fig. 1, 2:37-40.)  Notably, the patentees admitted during prosecution that these components and their associated functionalities—*i.e.*, "mobile communication device . . . internals and application platforms, NFC, smartcard internals and application platforms, payment protocols . . . and the working/workflow associated with POS [Point of Sale] and POE [Point of Entry] terminals, and the transaction and management servers"—were all "***known knowledge***."  (Ex. 1, '493 Patent File History, 3/20/15 Fisher Aff. at 11 (emphasis added); Ex. 2, '575 Patent File History, 5/5/19 Remarks at 9 (same).)[4] The patentees similarly acknowledge that the claimed "secure element" components—which include the "secure element memory," "secure element processor," "NFC processor," and "secure element application"—are conventional, as the specification incorporates by reference an earlier patent application stating that the "secure element" is "***commonly known*** as a smart card" that communicates via "signals

---

[4] "Prosecution histories constitute public records" that can be considered "[o]n a motion for judgment on the pleadings."  *Data Engine Techs. LLC v. Google LLC*, 906 F.3d 999, 1008 (Fed. Cir. 2018).

1  described in the Java Card 2.1 Platform API Specification." (Dkt. 1-2, '771 Patent at 1:31–35 (citing Ex.

2  3 hereto, U.S. Pat. App. No. 11/467,441 ¶ 31) (emphasis added).)

3  **2.    The NFC Security Patents' Claims Lack An Inventive Concept.**

4  As noted above, an inventive concept cannot be supplied "by invoking a computer merely as a

5  tool," *Customedia*, 951 F.3d at 1364; by the "mere recitation of concrete, tangible components"; or by

6  reciting the "performance of 'well-understood, routine, conventional activit[ies].'" *In re TLI*, 823 F.3d at

7  613 (quoting *Alice*, 573 U.S. at 225). The NFC Security Patents' claims lack an inventive concept because

8  they implement the abstract idea of providing security for an economic transaction using only

9  conventional computer components to carry out well-understood, routine steps of transmitting and

10  processing information.

11  As discussed above, the NFC Security Patents' independent claims recite only conventional

12  computer functionalities, such as "transmitting," "transferring," "receiving," "storing," "maintaining,"

13  "authenticating," and "executing," as well as conventional computing components, such as a "mobile

14  device," a "secure element memory," and a "management server." The patentees admitted during

15  prosecution that these items are "known knowledge" and "commonly known." (Ex. 1, '493 Patent File

16  History, 3/20/15 Fisher Aff. at 11; Ex. 2, '575 Patent File History, 5/5/19 Remarks at 9; Dkt. 1-2, '771

17  Patent at 1:31–36 (citing Ex. 3 hereto, U.S. Pat. App. No. 11/467,441 ¶ 31).)[5] The patentees likewise

18  admitted that the claimed "secure element application" covers previously existing software applications,

19  such as MasterCard's PayPass system. (*See* Ex. 1, '493 File History, 3/20/15 Fisher Aff. at 4 ("support

20  for the secure element application can be found, for example, in paragraph 45. The present invention can

21  also be interfaced with certain known and implanted payment protocols, such as Paypass").) Blaze's

22  infringement accusations regarding the claimed "identification code" similarly indicate that this term

23  encompasses various conventional forms of data, such as "credit card codes," an "encrypted version of

24  the [credit] card number," a "unique alpha numeric identifier," and a "surrogate credit or debit card

25  _____

26  [5] *See Automated Tracking Sols., LLC v. Coca-Cola Co.*, 723 F. App'x 989, 995 (Fed. Cir. 2018) (finding

27  claimed apparatus lacked inventive concept where "specification indicate[d] that the components of the

28  claimed invention are conventional").

1    number." (Dkt. 30-3 at 18, 22.)    The NFC Security Patents' reliance on these known computing

2    components and functionalities, whether individually or in combination, fails to provide an inventive

3    concept. *See Universal Secure Registry*, 10 F.4th at 1353 (finding "the combination of these long-standing

4    conventional methods of authentication yields expected results of an additive increase in security" and

5    does not supply an inventive concept to the abstract practice of "verifying the identity of a user to facilitate

6    a transaction"); *In re Jobin*, 811 F. App'x at 637–38 ("'online system,' 'server,' 'data structure,' and 'user

7    device' elements recite generic technology for implementing the claimed abstract idea [and] do not

8    transform the claim into a patent eligible application").

9        In addition, the NFC Security Patents' dependent claims merely recite the same abstract concept

10    of providing security for economic transactions on a mobile device as the independent claims do, but with

11    some narrowing requirements regarding how the conventional functionalities are implemented.    In

12    particular, the dependent claims recite additional requirements regarding: the type of payment method

13    used (*see* Dkt. 1-2, '771 Patent at claims 2–5, 11–13; Dkt. 1-1, '493 Patent at claims 3, 11; Dkt. 1-7, '575

14    Patent at claims 2, 5, 16, 18); the identification of generic components that transmit a digital artifact or

15    the type of digital artifact that is transmitted, such as "an advertisement, receipt, ticket, coupon, media,

16    metadata and/or content" (Dkt. 1-2, '771 Patent at claims 5–8, 14–17; Dkt. 1-1, '493 Patent at claims 4–

17    7, 12–15; Dkt. 1-7, '575 Patent at claims 3, 10, 16, 25, 27–30); conducting authentication using

18    "biometrics" (Dkt. 1-1, '493 Patent at claims 2, 10); the generic use of encryption (*see* Dkt. 1-2, '771

19    Patent at claims 9, 18; Dkt. 1-7, '575 Patent at claims 4, 17); the identification of generic components that

20    transmit the identification code (*see* Dkt. 1-1, '493 Patent at claims 8, 16); the identification of generic

21    components that store the payment method (*see* Dkt. 1-7, '575 Patent at claims 6–7, 19–20); routine

22    mobile device functionalities, such as retransmission requests (*see id.* at claims 9, 11, 22, 24); and

23    operability when not connected to a wireless network (*see id.* at claims 8, 21).    As with the Advertising

24    Patents' dependent claims, such "narrowing does not supply an inventive concept" and does not make the

25    NFC Security Patents' dependent claims eligible for patenting.    *BSG Tech*, 899 F.3d at 1287, 1291; *see

26    also Bridge & Post*, 778 F. App'x at 889.

27        Finally, Blaze's pleadings again fail to identify any inventive concept.    Blaze asserts in its

28    Counterclaims that the NFC Security Patents relate to "security improvements" achieved by using an

"identification code" and a "secure element" in an NFC-enabled device. (Dkt. 30 ¶ 20.)  As discussed above, however, providing security using a code is a well-recognized abstract concept, not an inventive improvement.  *See, e.g.*, *Universal Secure Registry*, 10 F.4th at 1349 (finding claims directed to use of "time-varying code" to "access a database that indicates any restrictions on the user's transactions" were unpatentably abstract).  Indeed, the Federal Circuit has previously rejected an argument that claims directed to conducting payment transactions were patentable because they allegedly "overc[a]me the problem of inadequate security for the transmission of payment information."  *Innovation Sciences*, 778 Fed. App'x at 863.  Moreover, as previously noted, the patentees acknowledged that the claimed "secure element" and "identification code" are conventional components, which they did not invent and which cannot be the source of any inventive improvement.  Narrowing the field of use for this abstract concept and these conventional components to NFC-enabled devices also does not make the NFC Security Patents' claims patentable.  *See, e.g.*, *buySAFE*, 765 F.3d at 1355 (noting "narrowing to particular types of" implementations "does not change the analysis" or "make the idea non-abstract for section 101 purposes").  For all of these reasons, the NFC Security Patents fail to introduce any inventive concept that could make patentable their claims directed to the abstract idea of providing security for an economic transaction conducted on a mobile device.

## C.    The Mobile Payment Patents Are Unpatentable Under § 101.

Blaze's '259 and '007 patents are directed to "conducting an online payment transaction through a point of sale device" using a mobile device. (Dkt. 1-6, '259 Patent at 1:30–48; Dkt. 1-8, '007 Patent at 1:41–43.)  These Mobile Payment Patents belong to the same family and have virtually identical specifications.  Like the other patents-in-suit, the Mobile Payment Patents' claims are ineligible for patenting because they are directed to an abstract concept—in this case, conducting payment transactions on mobile devices—and because, rather than supplying any inventive concept, they recite generic steps and components that are standard approaches for carrying out that idea.

### 1.    The Mobile Payment Patents' Claims Are Directed to the Abstract Idea of Conducting Payment Transactions on Mobile Devices.

Courts have repeatedly ruled that the concept of conducting a payment transaction, including with a remote seller, is an abstract idea.  *See, e.g.*, *Inventor Holdings, LLC v. Bed Bath & Beyond, Inc.*, 876

F.3d 1372, 1374, 1378 (Fed. Cir. 2017) (finding claims directed to "a method of purchasing goods at a local point-of-sale system from a remote seller" are "manifestly directed to an abstract idea" and reflect a "fundamental business practice that, when implemented using generic computer technology, is not patent-eligible under *Alice*"); *Innovation Scis.*, 778 Fed. Appx. at 863 (finding unpatentable claims directed to the "abstract idea of securely processing a credit card transaction with a payment server"); *Priceplay.com, Inc. v. AOL Advertising, Inc.*, 83 F. Supp. 3d 577, 580 (D. Del. 2015) (finding "[t]he patents claim the abstract idea of 'a sales transaction,' which is a fundamental economic concept" and hence unpatentable).

The Mobile Payment Patents' claims are directed to the abstract concept of conducting a payment transaction on a mobile device. The claims recite generic steps to send and receive data, involving a "list of products," a "purchase request," an "identification code," "login information," "authenticating" information, and a "transaction verification" between a "mobile device," a "remote management server," and a "transaction server." For example, claim 1 of the '259 patent recites:

1. A method for processing a transaction, comprising:

maintaining a non-browser based application in a mobile device memory included in a mobile device, wherein the non-browser based application is a mobile operating system platform based mobile application with a graphical user interface which includes a graphical icon that is preinstalled or downloaded and installed on the mobile device, wherein the non-browser based application only generates a non-browser based application generated screen, the non-browser based application generated screen corresponding to a specific screen or area of the non-browser based application, the mobile device comprising the mobile device memory, a mobile device display, a mobile device processor, and a mobile device wireless radio interface, a mobile device wireless fidelity (Wi-Fi) interface that supports voice and data interactions through a first wireless communication channel device using at least one of GSM and CDMA;

receiving, at the non-browser based application generated screen, a list of products from a remote management server for display using the non-browser based application;

receiving, at the non-browser based application generated screen, an identification of one or more products selected from the list of products from non-browser based application

generated screen, wherein the non-browser based application generated screen receives the identification of the one or more products selected from the list of products through user input via the mobile device display;

sending, from the non-browser based application generated screen, the identification of one or more products to the remote management server;

receiving a transaction purchase request from the non-browser based application generated screen, wherein the non-browser based application generated screen receives the transaction purchase request from the user via the mobile device display;

sending, from the non-browser based application generated screen, the transaction purchase request to the remote management server;

receiving user input login information including an identification code associated with the user from the non-browser based application generated screen, wherein the non-browser based application receives the user input login information through user input via the mobile device display;

sending, from the non-browser based application generated screen, the user input login information to the remote management server; and

receiving information authenticating the user associated with the user input login information from the remote management server and further wherein the remote management server receives a transaction verification from a transaction server which processes the transaction using a payment method that corresponds to the identification code associated with the user, wherein the payment method is stored at the remote management server; wherein the transaction verification indicates that the transaction has processed, and

receiving, at the mobile device, the one or more products from the remote management server.

(Dkt. 1-6, '259 Patent at claim 1.)  Claims 7 and 13 of the '259 patent, which are the patent's only other independent claims, recite this same subject matter in an apparatus (mobile device) format and a computer readable medium claim format, respectively.  (*See id.* at claims 7, 13.)  Independent claims 1–3 of the

1    '007 patent are likewise directed to the abstract idea of conducting a purchase payment transaction on a

2    mobile device, and recite a similar method that differs only in the point of view—including an apparatus

3    (transaction server) claim and a computer readable medium claim—and the order in which the steps are

4    presented.  (*See* Dkt. 1-8, '007 Patent at claims 1–3.)

5         The Mobile Payment Patents' claims are highly similar to payment transaction claims that the

6    Federal Circuit had previously found were impermissibly directed to the unpatentably abstract concept of

7    conducting remote payment transactions.  For example, in *Inventor Holdings*, the Federal Circuit found

8    that claims directed to "the use and processing of codes and communication between local and remote

9    systems" in order to conduct a payment transaction were unpatentably abstract.  *Inventor Holdings*, 876

10   F.3d at 1376.  Similarly, the *Innovation Sciences* decision involved claims directed to conducting a

11   payment transaction by "receiving credit card information at a server," sending payment information "to

12   an established financial channel," and receiving a "processing decision" and "payment confirmation."

13   *Innovation Scis.*, 778 Fed. Appx. at 863.  As illustrated above, the Mobile Payment Patents' claims recite

14   analogous subject matter and steps.

15        To implement the abstract concept of conducting a payment transaction on a mobile device, the

16   Mobile Payment Patents' claims recite only conventional steps involving "sending" and "receiving" basic

17   purchase-transaction information—such as a "list of products," an "identification of one or more

18   products," a "transaction purchase request," an "identification code," "login information,"

19   "authenticating" information, and a "transaction verification"—between purely conventional computing

20   components, such as a "mobile device," a "remote management server," and a "transaction server."

21   Indeed, the specification acknowledges, for example, that "[m]obile communication devices—e.g.,

22   cellular phones, personal digital assistants, and the like—are increasingly being used to conduct payment

23   transactions." (Dkt. 1-6, '259 Patent at 1:30-32; Dkt. 1-8, '007 Patent at 1:25-27.)  The generic steps and

24   components that the claims recite to conduct these payment transactions comprise features that are basic

25   to any remote purchasing transaction.  *See Virginia Innovation Scis., Inc. v. Amazon.com, Inc.*, No. 1:16-

26   cv-00861, 2017 WL 11500121, at *5 (E.D. Va. Dec. 22, 2017), *aff'd sub nom. Innovation Scis.*, 778 F.

27   App'x at 863–64 (finding "claims [recited] series of conventional steps performed in any online

28   transaction: receiving and transmitting information").  Because such claim limitations fail to provide

anything more than "a method of purchasing goods," they are "manifestly directed to an abstract idea." *Inventor Holdings*, 876 F.3d at 1378; *see also OpenTV*, 2016 WL 344845, at *5 (noting "practice of controlling access to information by verifying credentials (via well-known encryption methods)" is "a long-standing and well understood business practice that predates the internet").

As with the NFC Security Patents, the Mobile Payment Patents' exclusive focus on functional results—rather than on any supposed improvements in the components and steps recited in the claims— underscores the claims' abstract nature. *See Two-Way Media*, 874 F.3d at 1337. For example, the Mobile Payment Patents' specification states that "this specification describes a method and system for conducting an online payment transaction through a point of sale device," without identifying any alleged technical problem, let alone a purported solution. (Dkt. 1-6, '259 Patent at 2:46-48.) The specification depicts the components that conduct the communications recited in the claims as simple boxes labeled "mobile communication device" and "management server," and fails to identify any alleged inventive characteristics of these generic, conventional components (or of the recited "transaction server"). (*Id.* at Fig. 1.) Further, the specification does not even discuss the claim limitation "non-browser based application," and the claims merely present this component as a functionally-defined interface through which the user triggers the payment transaction. *Cf. Affinity Labs of Texas, LLC v. DirecTV, LLC*, 838 F.3d 1353, 1261–63 (Fed. Cir. 2016) (finding graphical user interface is a "generic feature[] of cellular telephones"). Notably, in concluding that Blaze's now-abandoned 14/867,328 application was unpatentable under § 101, the PTAB found that the term "non-browser based application," used in a similar claim limitation, did not make the claim patent-eligible, because the specification "does not differentiate between browser and non-browser applications in the functioning of the disclosed methods." *Ex Parte Michelle Fisher*, 2020 WL 1041299, at *8–9. Like the claims in that abandoned application, the Mobile Payment Patents' claims are unpatentably abstract.

## 2. The Mobile Payment Patents' Claims Lack an Inventive Concept.

Rather than disclose and recite any improvement in the way computers operate to conduct remote payment transactions, the Mobile Payment Patents simply describe and claim the use of conventional computing components, such as a generic mobile device and common servers, to perform the abstract idea of conducting mobile payment transactions. As discussed above, the patents' specification broadly

describes using any general-purpose mobile device—such as a "cellular phone," a "wireless personal digital assistant (PDA)," a "laptop computer," or any "other wireless communication device"—to perform mobile payment transactions, without describing any improvement in the way those devices can operate to facilitate the transactions.  (Dkt. 1-6, '259 Patent at 2:54–60; Dkt. 1-8, '007 Patent at 2:49–55.)  The "non-browser based application" and "graphical user interface" elements recited in the claims likewise are generic and conventional components of a mobile computing device.  *See, e.g.*, *Affinity Labs*, 838 F.3d at 1261–63 (finding graphical user interface is a "generic feature[] of cellular telephones" and user-downloaded application is not an "inventive concept"); *Smartflash LLC v. Apple Inc.*, 680 F. App'x 977, 984 (Fed. Cir. 2017) ("'interfaces,' 'program stores,' and 'processors' are all generic computer components and do not, taken individually or as an ordered combination, 'transform [the] abstract idea into a patent eligible invention'") (quoting *Alice*, 573 U.S. at 213–14); *Ex Parte Michelle Fisher*, 2020 WL 1041299, at *8–9 (rejecting argument that "non-browser application" limitation provided an inventive concept).  Further, the specification fails to disclose any allegedly novel or inventive features of the generic "remote management server" and "transaction server" recited in the claims.  The various other generic computer components recited by the claims, such as a "display," a "processor," and "memory," similarly fail to provide the required inventive concept.  *Cf. In re TLI*, 823 F.3d at 613 ("recitation of a 'telephone unit,' a 'server', an 'image analysis unit,' and a 'control unit' fail to add an inventive concept sufficient to bring the abstract idea into the realm of patentability").

The Mobile Payment Patents' dependent claims also do not add any inventive subject matter.  On the contrary, the dependent claims simply recite additional requirements regarding the implementation of the same abstract concept.  The dependent claims specify additional purely generic or conventional components and steps, such as: using "a credit card, debit card, or prepaid card" (Dkt. 1-6, '259 Patent at claims 2, 8; Dkt. 1-8, '007 Patent at claims 6, 9); using "biometric data" (*e.g.*, fingerprints) or a "PIN" as login information (Dkt. 1-6, '259 Patent at claims 3–4, 9–10); receiving a "digital artifact," such as "a receipt, advertisement, coupon, content, media, or a ticket," after the transaction (Dkt. 1-6, '259 Patent at claims 5–6, 11–12; Dkt. 1-8, '007 Patent at claims 18, 25, 32, 35); and accessing the "digital artifact" or the application screen when there is no network connection (Dkt. 1-6, '259 Patent at claims 15, 17–18, 27; Dkt. 1-8, '007 Patent at claims 10, 14, 19, 26).  Again, such "narrowing to particular types of"

1    implementations "does not change the [§ 101] analysis" or "make the [claimed] idea non-abstract for

2    section 101 purposes." *buySAFE*, 765 F.3d at 1355.

3        Moreover, Blaze's pleadings once again fail to identify any inventive concept.  Similar to its

4    argument regarding the NFC Security Patents, Blaze asserts in its Counterclaims that the Mobile Payment

5    Patents disclose "security improvements" for payment transactions by using "an identification code

6    transmitted from a non-browser-based application running on the mobile device." (Dkt. 30 ¶ 21.)  As

7    discussed above, however, the specification describes the "identification code" as a conventional "PIN."

8    (Dkt. 1-6, '259 Patent at 4:15–18, claim 10.)  The claimed "non-browser based application" is also a

9    conventional component. *See Inventor Holdings*, 876 F.3d at 1376 (finding "the use and processing of

10   codes and communication between local and remote systems" to conduct a payment transaction is not a

11   patentable concept); *Ex Parte Michelle Fisher*, 2020 WL 1041299, at *8–9 ("non-browser application"

12   limitation was not inventive).  Again, the specification and the claims do not explain how the use of a

13   conventional "identification code" and "non-browser based application" supposedly improves security,

14   nor do the patents identify any security problem that these features purportedly address.  For these reasons,

15   the Mobile Payment Patents fail to introduce any inventive concept that could make patentable their claims

16   directed to the abstract idea of conducting a payment transaction on a mobile device.

17   **VI.    CONCLUSION**

18       The patents-in-suit recite only conventional computing hardware that functions in conventional

19   ways to carry out three well-established commercial activities that the Federal Circuit has consistently

20   found are unpatentably abstract.  Because the claims impermissibly "recite no more than a computer

21   implementation of the[se] abstract idea[s]," *Bridge & Post*, 778 F. App'x at 891, they fail the *Alice* test

22   and are invalid under § 101.  Samsung therefore respectfully requests that the Court grant its motion for a

23   judgment on the pleadings holding the claims invalid and dismissing Blaze's infringement allegations.

24

25

26

27

28

1    DATED:  October 29, 2021

2                                                    Respectfully submitted,

3                                                    KIRKLAND & ELLIS LLP

4                                                    _/s/ Todd M. Friedman_
                                                     Brandon H. Brown (CA Bar No. 26347)
5                                                    KIRKLAND & ELLIS LLP
                                                     555 California Street
6                                                    San Francisco, CA 94104
                                                     Telephone: (415) 439-1400
7                                                    Facsimile: (415) 439-1500
                                                     Email: brandon.brown@kirkland.com
8

9                                                    Gregory S. Arovas (*pro hac vice*)
                                                     Todd M. Friedman (*pro hac vice*)
10                                                   Alex R. Henriques (*pro hac vice*)
                                                     KIRKLAND & ELLIS LLP
11                                                   601 Lexington Avenue
                                                     New York, NY 10022
12                                                   Telephone: (212) 446-4800
                                                     Facsimile: (212) 446-4900
13                                                   Email: greg.arovas@kirkland.com
                                                     Email: todd.friedman@kirkland.com
14                                                   Email: alex.henriques@kirkland.com

15                                                   David Rokach (*pro hac vice*)
16                                                   Nikhil Krishnan (CA Bar No. 300616)
                                                     KIRKLAND & ELLIS LLP
17                                                   300 North LaSalle
                                                     Chicago, IL 60654
18                                                   Telephone: (312) 862-2000
                                                     Facsimile: (312) 862-2200
19                                                   Email: david.rokach@kirkland.com
                                                     Email: nikhil.krishnan@kirkland.com
20

21

22

23

24

25

26

27

28

SAMSUNG'S MOTION FOR                    24                    CASE NO. 21-CV-02989-EJD
JUDGMENT ON THE PLEADINGS